UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

THE PECAN TRUST *et al.*,

    Plaintiffs,

v.

NEXUS RVs, LLC *et al.*,

    Defendants.

CAUSE NO. 3:22cv531 DRL

OPINION AND ORDER

Naomi and Christopher Pershing (and their revocable Pecan Trust) bought a Nexus-branded recreational vehicle they say is defective. Nexus RVs, LLC manufactured the unit with certain components built by Navistar, Inc. The Pershings (for short) sued after unsuccessful attempts at repair, and their express warranty claim against Navistar survived a motion to dismiss. Navistar asks the court to grant summary judgment under Rule 56 and make it final under Rule 54(b). The court grants Navistar a partial summary ruling only.

BACKGROUND

The following facts are those established by the record on summary judgment, as viewed in the light most favorable to the nonmovants. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). The Pershings purchased a 2022 Nexus Rebel 30R recreational vehicle on May 11, 2021 from Freightliner of Arizona. They soon realized the unit had a malfunctioning fuel fill system and associated fuel gauge (among other issues).

The unit was made with Navistar component parts that were modified by Nexus. Navistar manufactured a chassis containing essentially a generic fuel fill system. The parties materially agree that this system contains two fuel tanks—a front tank and rear tank—with connecting

hoses, a ground strap, a fuel fill neck, a fuel filler hose assembly and vent, a fuel filler nozzle receiver neck, a fuel control module, and a fuel transfer pump assisting with the fuel system's operation. The system in this unit was different from a generic system insofar as the 25-gallon front tank and 40-gallon rear tank each had its own fuel filler.

Navistar installed the fuel pumps, the transfer pump, and the fuel control module on its chassis. In this system, the engine draws and returns fuel from the front tank, and the system replenishes that fuel from the rear tank, with the components maintaining by design the fuel level between both tanks as a percentage of the whole. The fuel control module provides power to the fuel pump assembly; the transfer pump controls the fuel levels in each tank; and sensors in each tank communicate fuel levels to the body controller to trigger the system's transfer operation. The ground strap mitigates fueling-related static sparks.

Nexus modified the system while constructing the RV by connecting the fuel lines from the sidewall (where fuel is pumped in) to the fuel tank. Left undisputed for this motion today, Nexus installed the fuel lines at an improper slope, and this made it difficult to add fuel to the vehicle. Several Nexus Rebel units using a Navistar chassis had this issue. Nexus received no instructions from Navistar on how to run the fuel system vent line. Navistar offered by way of subscription, if requested by an original equipment manufacturer (OEM) like Nexus, a Body Builder Book—guidance, and indeed some requirements, on integrating the OEM's work to Navistar's chassis. Such books are commonplace in the industry.

After purchasing the unit, the Pershings repeatedly took it for repairs. From June 2021 to July 2022, the vehicle was worked on for 381 days by Kyrish Truck Centers, RWC International, and Selking International to address a faulty fuel fill system and several other issues. Over this

2

period, the fuel control module was replaced three times and the fuel transfer pump twice. Nexus paid for repairs under its warranty to reconfigure the Nexus fuel filler system, and Navistar paid for other repairs under its warranty. A January 2024 inspection of the recreational vehicle showed three defects because of inappropriate degrees of slope or drop in the hoses of the fuel system, and one defect because of a missing ground strap.

The Pershings sued Nexus and Navistar. Today's motion concerns only Navistar, and the Pershings originally sued the company only for express and implied warranty claims. On January 20, 2023, the court dismissed their implied warranty claim against Navistar, so the lone claim now facing the company is for breach of express warranty under the Uniform Commercial Code (UCC) and Magnuson-Moss Warranty Act (MMWA).

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d

918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

A.  *Applicable Law.*

A court sitting in diversity applies Indiana's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1015 (7th Cir. 2002). When the parties agree that no conflict of laws exists or fail to identify one worthy of analysis, the court will apply the law of the forum state. *See Tricor Auto. Grp. v. Dealer VSC Ltd.*, 219 N.E.3d 206, 216 n.7 (Ind. Ct. App. 2023); *Nelson v. Sandoz Pharms. Corp.*, 288 F.3d 954, 963 (7th Cir. 2002) ("If the difference between the state laws is illusory and no conflict exists, our inquiry ends and we apply the law of the forum state.").

The Pershings allege express warranty claims under Indiana, Arizona, and Texas law. The parties, having examined express warranty claims under each state's law and required to meet and confer by the court, seem to agree for purposes of today that no conflict exists—at least as it pertains to the issues of defect and causation. *See Bestwick v. Newmar Corp.*, 576 F. Supp.3d 599, 603 (N.D. Ind. 2021) (Arizona law); *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021) (Indiana law); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. Ct. App. 2002) (Texas law). The court thus applies Indiana law.

Under Indiana law, to prevail on an express warranty claim, a plaintiff must prove the existence of a warranty, its breach, causation, and damages. *Celina Ins. Co. v. Indianapolis Roofing &*

4

*Sheet Metal Corp.*, 953 N.E.2d 679, 679 (Ind. Ct. App. 2011); *see Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 364 (N.D. Ind. 2021). "[A]ny affirmation of fact or promise made by the seller to the buyer [that] relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Ind. Code § 26-1-2-313(1)(a). A seller breaches an express warranty when the goods fail to conform to the warranty, *see Martin v. Thor Motor Coach Inc.*, 602 F. Supp.3d 1087, 1094-95 (N.D. Ind. 2022), or when the warranty's remedy fails its essential purpose, *see* Ind. Code § 26-1-2-719(2); *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021).

"Timely notice of a breach of warranty is a substantive condition precedent to recovery." *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987). The warrantor must be given a reasonable opportunity to cure, often viewed as a reasonable time or a reasonable number of attempts at necessary repairs. *Zylstra*, 8 F.4th at 603, 606; *Litsinger*, 536 F. Supp.3d at 364-65. A "reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle, means at least three chances." *Zylstra*, 8 F.4th at 603; *accord Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019).

B. *Express Warranty and Defective Parts.*

Navistar says its parts weren't defective so it didn't breach its written warranty. Under its warranty, Navistar promised to "repair or replace any part of this vehicle which proves defective in material or workmanship, in normal use and service," with coverage specifically for the chassis, battery, engine, drivetrain, and other basic vehicle coverage [74-9]. It excluded components warranted or installed by other manufacturers. It appears Navistar intended its limited warranty to be passed on through to the "original owner" of the "new vehicle"—in short, that this warranty

5

applied to the Pershings as a consumer warranty in lieu of Nexus as a preceding purchaser. With that understanding, Navistar says the fuel fill issues that prevented the Pershings from properly filling the RV's gas tank and caused fuel gauge malfunctions resulted from Nexus's defectively designed fuel fill system.

In response, the Pershings agree that Nexus defectively designed the fuel fill system but argue this tells only half the story when triable issues remain as to whether (1) the Navistar fuel control module, transfer pump, or gauge—designed to maintain or measure the fuel level between the vehicle's front and rear tanks—were independently defective, (2) Navistar failed to share its Body Builder Book with Nexus so as to be responsible for Nexus's defective work, and (3) Navistar removed the system's ground strap. They say a jury must decide these questions.

The parties disclosed certain technical specialists. Nexus presented Thomas Fribley [74-3], who inspected the RV to address the fuel fill situation and concluded that the fuel lines were not installed or designed correctly because the lines were installed at a negative angle—a negative slope of three to four degrees when it should not have been less than a positive six degrees. This meant the fuel had to flow uphill and would naturally backflow and cause the user's fuel nozzle at the gas station to shut off. Mr. Fribley testified that this was an easy fix (around $4,000) and that Nexus (not Navistar) would be responsible for the reinstallation. He offered no opinion that Navistar's system retained a defect that was its responsibility.

The Pershings presented Thomas Bailey who inspected the unit too [74-6]. In his report, he recounts that the Pershings presented their RV for repairs and provides a summary of this history. During certain service visits, the fuel control module and fuel transfer pump were replaced. He says the Pershings tested the fuel system in July 2022 (documenting the results by

6

photographs and videotape). He opines that these "results reflect the fuel system defects have not changed from the seven repairs attempted."

That said, in his defect analysis post-sale chart, Mr. Bailey identifies no defect today in the module or pump—only issues with the fuel gauge and with fuel not transferring. In his opinion, he says (much like Mr. Fribley) that the fuel fill system's hoses must be reinstalled with no sags or kinks and with the proper angle of elevation to address the fuel system's issues—as prescribed by Navistar but not done by Nexus. In short, for a reasonable jury, that the module and pump may have needed an earlier fix, or had been replaced before (the Pershings says three times and two times respectively), would show the warranty in action, not the warranty in breach—not without evidence that Navistar's work (the module or pump) remain defective.

Mr. Bailey never says they are, insofar as the parties point to the record; instead, he blames the hoses. Without more, that the unit may have needed repairs of the module or pump, which thereafter occurred as an offered cure, doesn't mean that Navistar breached its warranty if the lingering root cause today, by agreement, is hose elevation or placement (Nexus's work). The warrantor must be given a reasonable opportunity to cure. Mr. Bailey also never attributes the fuel gauge issue to anything other than the hoses as necessary fixes. Mr. Bailey's findings might support an inference for a jury that the Pershings at one time had (or may have had) a right to warranty coverage for repair or replacement parts, but not that Navistar has an unsatisfied warranty obligation now.

The Pershings also presented opinions from a mechanical engineer, Gary Derian, who likewise inspected this unit [74-5; 76-1]. Though the fuel control module and fuel transfer pump may have needed replacement, he says the "root cause" of these part replacements (after the first)

7

was the "defectively designed Nexus fuel fill system." He explained that when an issue isn't solved by repeatedly replacing the same parts, those parts are likely not the problem. He concludes in his report and testimony that the misaligned hoses need correction—diagnosing the "main problem" as "dips in the vent hose" or "flat and saggy" hoses—once more, Nexus's work, not Navistar's. He says this explains the fuel gauge issue too. In sum, Mr. Derian would add nothing to creating a genuine triable issue for the Pershings against Navistar.

Mike Hill, a service manager at Selking International who worked on this RV, echoed this now growing chorus. He said Nexus paid for Selking's work to reconfigure the fuel filler neck system. He too attributed the fuel system issues to "not enough slope" in the fuel lines—a "common sense" problem with a fairly simple fix. Gregg Montieth, Navistar's director of warranty, reiterated that Nexus should have installed the hoses with more "fall" in them. He agreed that Navistar approved and paid three warranty claims and agreed with the plaintiffs' mechanical engineer that when a system continues to have issues after replacements of the pump or module, it means something else is the likely cause, and here that was Nexus's installation of the hoses. A Nexus engineer, Ed Burkett, testified that his company, since 2023, has made a design change to address this issue, but not apparently addressed this for the 2022 unit purchased by the Pershings.

The Pershings call the question of a defect, or its cause, a "battle of the experts." A reasonable jury could not see this record as anything but these many technicians and other witnesses wondering why they have been called to a trial merely to say materially the same thing. Whether the fuel control module or transfer pump needed to be replaced at some point, nothing shows that Navistar failed to provide a cure via its warranty, or that any genuine factual dispute

8

remains that these parts (as opposed to the misaligned hoses) are the reason for the fuel system malfunctioning today. The Pershings have not argued, and likely this was smart on this record, that Navistar nonetheless breached the warranty because either its remedy failed its essential purpose or the company's repairs took the unit inordinately out of service. Nor could a reasonable jury speculate that the fuel gauge issue stems from anything but these poorly designed or installed hoses. The Pershings retain a claim against Nexus on these fronts, but not Navistar.

To salvage a claim against Navistar, the Pershings fall back to argue that the company withheld its Body Builder Book from Nexus, which contains design guidelines for OEMs. The Pershings contend that Navistar is responsible for Nexus's defectively designed fuel fill system because this book would have given Nexus sufficient instructions to design the fuel system properly.

There are roadblocks to this theory. For one, everyone seems to understand that these books are common in the RV industry, and a downstream manufacturer like Nexus could have accessed Navistar's book by subscription to the extent Nexus, an otherwise sophisticated OEM, needed help to appreciate what some have characterized as a common sense method of installation based on simple engineering principles (*e.g.*, gravity). Indeed, certain specialists acquired the book to serve as a reference to their proposed opinions without seeming difficulty.

For another, the Pershings advance a UCC-based claim (via the MMWA) under Navistar's express warranty, not a tort claim. This makes perfect sense given the mere economic losses here, but the point is that the Pershings have not established why the failure to provide this build-book affirmatively to Nexus breached the warranty's terms. Navistar warranted its parts that proved "defective in material or workmanship"—in short, something it gave by way of material or

9

workmanship, not something it didn't give. *See also Smith v. Nexus RVs, LLC*, 468 F. Supp.3d 1012, 1021-22 (N.D. Ind. 2020) (explaining this language covers build issues, not design defects). The warranty never imposed on Navistar the additional duty to provide instructions to Nexus.

That leaves the ground strap in this fuel system for discussion. Messrs. Fribley, Derian, and Bailey each observed that the ground strap, normally attached to a fuel tank, was missing from this recreational vehicle. They explain that a missing or disconnected ground strap is a safety risk because it creates an electrical fire hazard. Both sides agree that Navistar manufactured and installed the ground strap for the fuel fill system. The Pershings thus theorize that the ground strap must have been removed at some point during repairs.[1]

The starting problem is that they don't cite any particular evidence for who did it. They don't know whether that was during Nexus's original work or during its repairs (or those of its designated service centers), or alternatively during Navistar's repairs. Mr. Fribley confessed he had not analyzed the repair records to determine when it might have happened. He agreed a repair technician would typically notice and document such a concern (a conclusion echoed by Mr. Hill). Mr. Fribley said the missing strap could have happened when Nexus installed a fuel-fill kit during its manufacturing (a possibility echoed by Mr. Monteith), or it could have happened during removal of the fuel assembly or the hoses.

Rather than point to evidence with specificity, the Pershings cite generally to 408 pages of repair work orders in the hope that the court will just assume an answer or triable issue lies within [76-2, 76-3, 76-4]. This fails their burden. They must cite particular pages or excerpts at summary

---

[1] This isn't a negligence case. The Pershings posit a *res ipsa loquitur*-like theory that the missing strap would not occur absent someone's negligence. Whether such a theory might play in a negligence case, their claim against Navistar is based on express warranty.

10

judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); N.D. Ind. L.R. 56-1(b)(2)(C) (party must "cit[e] to evidence supporting each dispute of fact"); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n.10 (7th Cir. 2002) ("it is not the responsibility of this court to ferret through the record for support"); *Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 353 (N.D. Ind. 2021) ("it isn't the court's job to find the needle in the haystack, the truffle in the field, or the Waldo on the page").

Given the conclusions from technicians and other witnesses, the universal understanding that any repairman would necessarily document this safety hazard (a "red flag" as Mr. Fribley calls it), and the absence of any such notation in the repair records cited particularly on this record that pinpoints its origin, the only reasonable inference for a jury is that the last party to have worked on the fuel system was the party responsible. No one attributes the missing ground strap to the Pershings or normal wear and tear.

As it turns out, it appears (from Mr. Bailey's historical summary and Navistar warranty records [76-5]) that RWC International last worked on the system by installing a new transfer pump in June and July 2022. This was a repair shop authorized to perform work for Navistar under its warranty. Accordingly, this qualifies as Navistar's work. The only reasonable conclusion on this record is that Navistar's service center, designated to perform warranty repairs for the company, failed to reinstall the ground strap or missed fixing it altogether.

To note, Navistar "cannot abdicate its duties in warranty merely by designating a service center for repairs, at least not in the manner that occurred here." *Litsinger*, 536 F. Supp.3d at 366. The MMWA allows a warrantor to name representatives to perform duties under a written warranty, but "no such designation shall relieve the warrantor of his direct responsibilities to the

11

consumer." 15 U.S.C. § 2307. And no such designation on this record made RWC a cowarrantor to relieve Navistar. *See* 15 U.S.C. §§ 2304(a)(4), 2307; *Litsinger*, 536 F. Supp.3d at 366-67. The ground strap would seem an elementary fix; but, without any other argument for summary judgment, the court must deny the motion in this respect.

The parties last debate whether a brake pressure switch constitutes a defect worthy of an express warranty claim. Navistar issued a safety recall for this part in June 2023, noting the issue may be a fire risk. From the recall alone, Mr. Bailey concludes that this might pose a fire risk. The Pershings argue (in response to a *Daubert* motion) that they are not relying on Mr. Bailey to establish a defect in the brake pressure switch. Enough said—the court takes them at their latest word, notwithstanding any other earlier point.

They argue instead that Mr. Bailey relies on the recall alone to suggest a fire hazard. That a recall has occurred may be evidence of certain things—namely as a subsequent remedial measure—but it cannot show a product defect. *See* Fed. R. Evid. 407; *Hughes v. Stryker Corp.*, 423 F. Appx. 878, 880 (11th Cir. 2011). In reality, products subject to a recall might have a defect or might not, as a recall implements a safety campaign to ensure that none do or will manifest one. If Mr. Bailey has not been offered to establish a defect in the brake pressure switch, then his mere reiteration of the recall offers nothing on which a reasonable jury could find a defect. And, pragmatically, it seems quite clear, given his recounting of the unit's repair history that concludes in July 2022, that the Pershings have never presented it to Navistar for work under a recall that was initiated in June 2023. This theory would get nowhere fast—the mere fact of a recall doesn't mean the Pershings have an express warranty claim when they have not given Navistar a reasonable chance to address it. *See Zylstra*, 8 F.4th at 603, 606.

With this said, the court must deny the request to make this ruling final for purposes of appeal. *See* Fed. R. Civ. P. 54(b). There is just reason for delay when today's ruling has not exhausted all claims against Navistar. *See, e.g., Lawyers Title Ins. v. Dearborn Title Corp.*, 118 F.3d 1157, 1162 (7th Cir. 1997).

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART Navistar's summary judgment motion [74], DENIES its request for entry of final judgment, DENIES AS MOOT the earlier-filed summary judgment motion [67], and DENIES AS MOOT Navistar's motion to exclude Thomas Bailey's and Gary Derian's opinions [81].

SO ORDERED.

May 27, 2025                                  *s/ Damon R. Leichty*
                                              Judge, United States District Court